**BIGELOW et al. v. TWENTIETH CENTURY–FOX FILM CORP. et al.**

**No. 10044.**

United States Court of Appeals, Seventh Circuit.

June 8, 1950.

Thomas C. McConnell, Chicago, Ill., for appellants.

Francis E. Matthews, Chicago, Ill., John F. Caskey, New York City, Robert W. Bergstrom, Chicago, Ill., Barnet Hodes, Louis M. Mantynband, LeRoy R. Krein, Chicago, Ill., Matthews & Springer, Chicago, Ill., Dwight, Royall, Harris, Koegel & Caskey, New York City, and Arvey,

Hodes & Mantynband, Chicago, Ill., for appellees.

Before MAJOR, Chief Judge, DUFFY and FINNEGAN, Circuit Judges.

MAJOR, Chief Judge.

Plaintiffs appeal from an order entered October 6, 1949, permitting the motion picture, "Come to The Stable," to be exhibited in the United Artists Theatre, operated by defendant Balaban & Katz Corporation, for a period of eight weeks on an exclusive first run. The petition upon which the order was entered was filed by Illinois-United Artists Theatre Company, a Delaware corporation, but upon a showing that it had no property interest in pictures played in the United Artists Theatre, defendant Twentieth Century-Fox Film Corporation joined in the petition.

The instant controversy is an aftermath of a suit instituted by the plaintiffs under the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1-7, 15 note, for an injunction and the recovery of treble damages. The gist of the complaint was that by reason of a conspiracy among the defendants plaintiffs were prevented from securing pictures for exhibition in their theatre until after the preferred exhibitors had been able to show them in the earlier and more desirable runs, and that as a result plaintiffs had been discriminated against in the distribution of feature films in favor of competing theatres owned or controlled by some of the defendants. In that suit a jury returned a verdict for $120,000 in plaintiffs' favor, and thereupon the trial court gave judgment for treble that amount. The matter of enjoining the defendants was reserved for future action.

Upon appeal, this court affirmed the finding of conspiracy alleged in the complaint but reversed on the question of damages. Bigelow v. RKO Radio Pictures, 7 Cir., 150 F.2d 877. Upon certiorari, the Supreme Court affirmed the judgment of the trial court both upon the finding of conspiracy and the award of damages. 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652. The cause was remanded to the trial court, whereupon plaintiffs filed a supplemental complaint in which they prayed for equitable relief. On October 16, 1946, the District Court entered a decree enjoining the defendants from engaging in numerous designated activities designed to terminate and prohibit a continuation of the conspiracy. With the exception of one provision which was ordered modified, this decree was affirmed by this court. 162 F.2d 520. Subsequently, the lower court adjudged one of the defendants, RKO Radio Pictures, Inc., guilty of contempt in violation of the decree, which was also affirmed by this court. 170 F.2d 783.

We need not enter any detailed narration of the facts giving rise to and involved in this prolonged litigation. They are fully revealed in the previous opinions of this and the Supreme Court. It is pertinent perhaps to note that all the proceedings from their inception, including that which culminated in the order appealed from, have been heard and decided by a single Judge, namely, Honorable Michael L. Igoe.

The court below made no findings of fact other than those contained in a memorandum opinion wherein it is stated:

"The evidence indicated that 'Come to the Stable' is a story conveying a message of religious significance, and that a run of more than two weeks is needed to establish the character of the film, an achievement which should also be of benefit to the outlying theatres.

"At the time the decree was entered, the possibility was contemplated that under certain circumstances, outstanding motion pictures might be presented for more than two weeks. I believe that 'Come to the Stable' is such a picture and that an extended first run would not conflict with the decree. While there can be no doubt that the petitioner is interested in the commercial success of the picture, that concern does not affect my conclusion that the motion picture is one of unusual character justifying special allowances under the decree. 'Come to the Stable' may therefore be exhibited in the United Artists Theatre for a period of eight weeks, on an exclusive first run."

Plaintiffs contend that the court was without jurisdiction to modify its decree of

October 16, 1946, and that in any event it was without power or authority so to do. Defendants argue to the contrary and further contend that a proper construction of the decree gives the court a discretionary power under its duty to execute and enforce the decree. It may be noted that the decree provides "That jurisdiction of this case shall be and it is hereby retained for the purpose of enforcing and modifying this decree."

Both sides lay much stress upon the decision in United States v. Swift & Co. et al., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999. That case immediately dispels any contention that the court in the instant matter was without jurisdiction. In the Swift case the court stated, 286 U.S. page 114, 52 S.Ct. page 462: "We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions though it was entered by consent. * * * A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need." There, it was held, however, that the court was without power to modify the injunction in the absence of a proper showing of changed conditions not readily foreseeable at the time the decree was entered. As to the power of the court in the instant matter to modify, we think the same reasoning must be applied. In our judgment, there was neither sufficient allegation nor showing which would authorize the court to modify its decree. The main argument of defendants on this score is that the defendant Twentieth Century-Fox Film Corporation in complying with the decree has adopted a completely different method of distributing pictures in the Chicago area. This evidently is not a changed condition within the holding of the Supreme Court in the Swift case. There referring to the decree, the court stated, 286 U.S. page 116, 52 S.Ct. page 463: "It did not say that the privilege to deal in groceries should be withdrawn for a limited time, or until the combination in respect of meats had been effectually broken up. It said that the privilege should be renounced forever, and this whether the units within the combination were acting collectively or singly. The combination was to be disintegrated, but relief was not to stop with that."

We need not, however, further labor the point as to the court's power to modify its decree for the reason that in our judgment the order under attack cannot be regarded as a modification. The decree remains just as it was and its validity is not now open to attack. The important and controlling question is whether the court had any discretionary power to permit a limited suspension of a single provision of the decree upon the application of a party to whom it was directed. And this involves a construction or interpretation of the relevant portions of the decree.

The material provision is contained in paragraph VII, wherein the defendants are enjoined "from delaying the exhibition of any motion picture in the Chicago Exchange territory by permitting a run of such picture *longer than two weeks on a first run in a theatre owned, leased or operated by any defendant* or for a run longer than one week on any subsequent run of such picture in a theatre owned, leased or operated by any defendant or by creating dead or waiting time between the conclusion of the first run of a picture in any such theatre in such territory and the next succeeding run of said picture or from permitting move-overs in the same run of a picture from one theatre owned, leased or operated by any defendant to another such theatre or from preparing, publishing, adopting, enforcing or attempting to enforce any uniform plan, system or schedule of release or clearance *with the intent, for the purpose or with the effect of accomplishing the performance of any of the acts enjoined in the foregoing paragraph V hereof.*" (We have italicized the phrases of this provision material to the question before us.)

Plaintiffs argue that this provision is plain and unambiguous and, therefore, definitely and certainly fixed the rights of the parties. The validity of the argument that the court was without power to grant the permission under attack is dependent upon the soundness of this premise. Defendants contend that the injunction against a first

run of more than two weeks is limited or qualified by the phrase, "with the intent, for the purpose or with the effect of accomplishing the performance of any of the acts enjoined in the foregoing paragraph V hereof." More specifically, it is contended that the last phrase of paragraph VII (above quoted) is applicable to all the acts enjoined in said paragraph, while plaintiffs contend that it is only applicable to the enjoined act which it immediately follows. Defendants' grammatical construction of this provision finds support in Porto Rico Railway, Light & Power Co. v. Mor, 253 U.S. 345, 348, 40 S.Ct. 516, 518, 64 L.Ed. 944, wherein the court stated, "When several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all."

█ In the view which we take of the language employed in paragraph VII, we doubt if it was the intent or purpose to make the inhibitions therein contained absolute and final. Their continuing existence apparently was made dependent upon the injunctive provisions of paragraph V, which enjoined the defendants from preventing plaintiffs from obtaining suitable pictures on desirable runs, free of unreasonable clearances and of any conditioning of license contracts and of fixing admission prices. Under this construction of paragraph VII, it would seem that the court, consistent with its duty to enforce the decree, was vested with the discretionary power to determine if the running of a picture for a longer period than two weeks would impinge upon the rights of the plaintiffs, protection for which was accorded by paragraph V.

This construction of the decree is convincingly supported by the record. As plaintiffs say in their brief, "The issue, we submit, must be viewed not only on the sufficiency of the petition itself and the proof in support of the same but against the background of what has occurred in the District Court both prior and subsequent to the entry of the injunction." When the decree was being considered by the court, counsel for the plaintiffs stated, "If they come in and show your Honor that they are not holding back any product by extended runs in the loop, and that is what the decree says, only when they use that monopoly to hold it back and keep it away from us are they enjoined, if they can show that they are not holding it back by that practice a monopoly they certainly have nothing to fear as to a charge of contempt in this case." And in the same argument, in response to the court's inquiry as to what wrong could be done by permitting a long run in a downtown theatre of a fine, artistic production, counsel for plaintiffs stated, "In that particular case, if they can come in and show in a particular instance there, a picture is being put in that position merely on the merits of the picture, and that they are not using that as a means or device to hold back the product, I do not think that they would be adjudged in contempt of court."

Moreover, plaintiffs themselves, on May 14, 1948, filed a petition to "modify and clarify the decree." Relying upon the reservation of jurisdiction contained in paragraph XI of the decree, it was requested "that the language of said decree be modified and clarified in certain respects in order to avoid further controversy with defendants over the meaning thereof," and, referring to the argument made prior to the entry of the decree, that "counsel for petitioners stated in open court that Sec. XI of the decree would in the future afford this Court the opportunity to modify its decree to conform to the provisions of the decision of the Supreme Court of the United States in the Paramount case." In other words, plaintiffs' counsel at the time the decree was entered urged upon the court that it was retaining jurisdiction to modify the decree in accordance with the views which the Supreme Court might express in the Paramount case then pending in the Supreme Court, which was later decided May 3, 1948, U. S. v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260. And it was argued that the court should retain this power so as to "effectuate the intent of this court." In contrast to plaintiffs' position at that time as to the court's power relative to its decree, it is now urged not only that the court is without power but

that neither the intent of the court nor the parties is material other than as shown by the express language of the decree.

In the interim between the entry of the decree and the order involved in the instant appeal, a number of petitions requesting permission for an extended Loop run of certain pictures were filed. The proceedings had thereon are contained in the instant record. The permission thus sought was in some instances denied and in others allowed. Even a summary of such proceedings would perhaps serve no useful purpose. We shall only refer to a petition filed October 5, 1948 by Twentieth Century-Fox Film Corporation, asking for an extended run for the picture, "The Snake Pit," and a petition filed by Universal Film Exchanges, Inc., for an extended run of the picture, "Hamlet," both of which were allowed. The proceedings on these petitions are enlightening as showing the position which counsel for the plaintiffs then took regarding the decree of October 16, 1946. There, counsel stated to the court, "These petitions of course are addressed to the discretion of the court," and, referring to the decree, stated, "As I remember it, your Honor had in mind, as I recall it, that if there was some exceptional picture, and the thing we were talking about at the time was Bing Crosby's picture, 'Going My Way,' which was good entertainment and which everybody enjoyed and which was having a good run, I believe, at the Woods Theater at the time—whether or not in that situation, brought to the attention of the Court, there could not be some exception made. In deference to your Honor's opinion and without any reservation at all resting in your Honor's judgment of whether your discretion should be exercised in a given situation, I have come to the position that that is a matter which your Honor should determine, but with this qualification: * * *." The qualification which counsel stated was not directed at the lack of discretionary power in the court but that such power should be cautiously exercised.

The court allowed the request then made and in doing so among other things stated, "The decree that was entered here I think destroyed the real evil in connection with the practice about which Mr. McConnell's client complained. * * * At the time that decree was framed, upon which this argument had been conducted, a suggestion arose as to whether or not a definite and a certain time beyond which first runs could not be carried on in the Loop would be a reasonable article or part of that decree. * * * At the time this decree was framed, I said that very point arose, as to what should be the length of runs permitted the first showing of pictures in the Loop. Two weeks was arbitrarily set. * * * It is not only hard, it is impossible to make any definite, certain rule that will control all the activities of any industry, particularly an industry with so many complex problems as the motion picture industry. So now we are met again with the situation as to what is the thing that is reasonable under the circumstances which have been presented in this hearing."

It appears plain that a two-week period was not arrived at by any magic formula or scientific process. Such time was, as Judge Igoe stated, arbitrarily fixed. Such period no doubt could have as well been fixed at a shorter or longer term. Thus, it seems plain that both the court and plaintiffs' counsel understood both at the time the decree was entered and subsequently that the court was vested with a discretion to permit the run of a Loop picture for a longer period than that designated in the decree.

In this court counsel for plaintiffs, as to the meaning and effect of paragraph VII, among other things stated, "It should be noted at the outset that none of these acts is enjoined except when done 'with the intent, for the purpose or with the effect of accomplishing the performance of any of the acts enjoined in the foregoing paragraph V hereof.'" Now it is contended, as we have heretofore shown, that the injunction in paragraph VII against a first run of longer than two weeks is not dependent upon or qualified in any manner by the provisions of paragraph V. It is true, as pointed out by plaintiffs, that the defendant Balaban & Katz in this court, on appeal from the decree, stated, "The effect of this provision is to prohibit B&K and RKO from exhibiting any picture for a period of

more than two weeks on first run." We assume what we think the fact to be, that it was then urged upon this court that the inhibition contained in paragraph VII was unqualified. Relevant to this particular point, this court made no specific ruling on the opposing theories advanced as to the meaning of paragraph VII. The fact, however, that we affirmed the decree indicates that we embraced plaintiffs' interpretation and rejected that of defendants.

■ It is, therefore, our view that the action of the court did not result in a modification or alteration of its decree so as to bring its action within the condemnation of United States v. Swift & Co., supra. That the decree is susceptible of an interpretation which lodges in the court a discretionary power can hardly be doubted, and that the court upon the entry of the decree, as well as counsel for the plaintiffs both at that time and subsequently, so understood, is equally plain. We recognize, as pointed out by the plaintiffs, that numerous applications for permission such as was granted in the instant case imposes an onerous burden upon the court and perhaps a hardship upon the plaintiffs by reason of the continuing litigation resulting therefrom. But that court, as this, must appraise the situation as it is and not as plaintiffs now think it should be. We cannot assume for the purpose of establishing a precedent favorable to plaintiffs that the court will not in the future, as it has in the past, exercise its discretion in a manner to protect the rights of the plaintiffs, established only as a result of long and expensive litigation.

In conclusion, we think it appropriate to quote from plaintiffs' brief a statement complimentary to Judge Igoe but which at the same time reflects credit upon plaintiffs' counsel. The statement is as follows: "* * * we concede that Judge Igoe has acted throughout this litigation in conformity with the highest traditions of the Federal judiciary. If the jurisdiction assumed is warranted here, we do not believe there is any judge better qualified to pass on these applications. Further, we believe Judge Igoe has assumed this jurisdiction because he has felt that the original decree had to draw arbitrary time limits on a first run which, in certain instances, standing alone, would of necessity appear harsh and inequitable. We have no criticism of this attitude in so far as the equities could be limited to a particular situation."

The order appealed from is affirmed.